Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff, SITI AISHAH RIDZUAN

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SITI AISHAH RIDZUAN, on behalf of herself and all similarly situated persons,<br><br>Plaintiff,<br><br>v.<br><br>CATHAY BANK, a California banking corporation,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>1) Cal. Penal Code § 631<br>2) 18 U.S.C. § 2511(1)(a)<br>3) Cal. Bus. & Prof. Code § 17200, *et seq.*<br>4) Cal. Constitution Art. I § 1<br>5) Intrusion Upon Seclusion<br>6) Unjust Enrichment |

Plaintiff SITI AISHAH RIDZUAN ("Plaintiff") files this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Defendant CATHAY BANK, a California banking corporation ("Defendant" or "Cathay Bank"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all others, by and through the investigation of undersigned counsel.

## I. NATURE OF THE ACTION

1. This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.cathaybank.com (the "Website"), a website that Defendant provides for public access and use.

2. Plaintiff personally used the Website during the class period, including on August 11, 2026, and preserved an HTTP archive file, commonly known as a HAR file, of one of her own browsing sessions. A HAR file is a record of the network exchanges between a browser and the servers with which it communicates, including the requests the browser sends, the headers and parameters those requests carry, and the responses received.

3. Plaintiff's HAR file accordingly records the requests her browser transmitted to the Third Party identified below during that session, including the named parameters carrying the contents of her communications and the persistent identifier transmitted with them. The figures reproduced below are from an independent technical investigation counsel commissioned, which replicated the URLs and user flows recorded in the HAR file, and are included as corroboration.

4. During her use of the Website, Plaintiff navigated to multiple pages on the Website, unaware that Defendant was causing and permitting a third party to intercept the contents of her communications and reveal the banking and financial subject matter she was reading about.

5. Defendant caused the interception of the contents of Plaintiff's communications with the Website, including the page addresses identifying what she

was browsing and the page titles identifying the subject matter of the pages she was reading, by causing each such communication to be duplicated and routed to the Third Party over separate channels while the same content was still being transmitted between her browser and servers operating under Defendant's control.

6. As set forth in the Specific Allegations section of this Complaint below, Defendant surreptitiously embeds and operates third-party tracking technology on the Website that intercepts the contents of users' electronic communications, including the page addresses and page titles reflecting what users are browsing, in real time and without notice or consent. Defendant intentionally deploys this technology to accomplish its commercial objectives, including identifying the visitors to its Website, building audiences of those visitors, and directing advertising for its own banking products to them.

7. Defendant deploys this interception technology in violation of the California Invasion of Privacy Act, Cal. Penal Code § 631, and the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a). Plaintiff directly observed the Website configured in this manner during her August 11, 2026 session, and it remains so configured. On information and belief, and subject to proof following discovery of Defendant's tag-management records and its agreements with the Third Party, the Website was configured in this manner throughout the class period.

## II. GENERAL ALLEGATIONS

8. A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded, or a user performs a tracked action.

9. When triggered, the pixel causes the user's browser to transmit data to third-party servers, including the contents of the user's communications with the Website such as page addresses identifying what the user is browsing, page titles identifying the subject matter of the page, session-level identifiers, and browser and device

characteristics.

10. When users visit the Website, Defendant causes tracking technology to be embedded in visitors' browsers. This includes, but is not limited to, the following:

- The Google Tracker

11. The third party who operates the above-listed tracker is designed to use, and on information and belief does use, the intercepted contents of users' communications collected via the Website for its own independent purposes tied to broader advertising ecosystems, profiling, and data monetization strategies, which go beyond Defendant's direct needs, for its own financial gain. The above-listed tracker is referred to herein as the "Tracker" and its operator is referred to as the "Third Party."

12. The Tracker is operated by Google LLC, a limited liability company headquartered in Mountain View, California. Defendant knowingly embeds and deploys the Tracker on the Website and configures it to execute automatically within users' browsers upon page load. The Tracker's transmissions are associated with Defendant's own advertising account with the Third Party. The Tracker is not a resource users request and is not necessary to render the Website's content or functionality.

13. Defendant configured the Website so that the contents of each user's communication with the Website were duplicated into separate third-party transmissions. When a user's browser requested a page, code that Defendant embedded on the Website obtained the contents of that communication from the state of the browser for the page then being loaded, wrote those values into named parameters of separate requests, and directed the browser to send those requests to servers the Third Party controls. Those additional transmissions served no part of the user's request for the page. No user action was required and none of it was visible.

14. Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Tracker on their devices and did not consent to the contents of their communications with the Website being intercepted by a third party. The Website did not display any consent banner, pop-up, cookie notice, or other

authorization mechanism requesting permission before deploying the Tracker to intercept user communications. Defendant did not obtain express prior consent for the interception and transmission of the contents of users' communications for advertising, analytics, or monetization purposes.

15. Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

## III. PARTIES

16. Plaintiff SITI AISHAH RIDZUAN is a California citizen residing in Contra Costa County, California, and has an intent to remain there. Plaintiff was in California when she visited the Website, which occurred during the class period including but not limited to on August 11, 2026. The allegations set forth herein are based on the Website as configured when Plaintiff visited it.

17. Defendant CATHAY BANK is a California banking corporation organized and existing under the laws of the State of California, with its principal place of business in Los Angeles, California. Defendant owns, operates, and controls the Website. Through the Website, Defendant markets and offers consumer and commercial banking products and services, including credit card accounts, savings and money market accounts, individual retirement accounts and certificates of deposit, and wealth management, financial planning and life insurance products, and publishes consumer financial education content.

18. Defendant owned, operated and controlled the Website at all times during the class period, and publicly identifies www.cathaybank.com as its own website.

19. Through the Website and its branch network, Defendant conducts banking business in California and throughout the United States.

## IV. JURISDICTION AND VENUE

20. Defendant is subject to the general personal jurisdiction of this Court. Defendant is a banking corporation organized under the laws of the State of California and maintains its principal place of business in Los Angeles, California. Defendant is

therefore at home in this State, and this Court may exercise jurisdiction over it under Federal Rule of Civil Procedure 4(k)(1)(A) and Cal. Code Civ. Proc. § 410.10.

21. Plaintiff's claims also arise out of and relate to Defendant's conduct in this State. Plaintiff accessed the Website from California, and the interception of the contents of her communications occurred on her device in California, through a Tracker that Defendant placed and configured on the Website.

22. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts a claim arising under federal law, specifically 18 U.S.C. § 2520, which provides a civil cause of action for violations of 18 U.S.C. § 2511(1)(a) of the Federal Wiretap Act.

23. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claim that they form part of the same case or controversy under Article III of the United States Constitution.

24. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b) because (1) Defendant regularly transacts business in this District, operates the Website that serves California residents in this District, and is subject to personal jurisdiction here; (2) a substantial part of the events or omissions giving rise to the claims occurred within this District, including Plaintiff's California-located use of the Website from her Contra Costa County residence; (3) Plaintiff resides in this District; and (4) Defendant derives substantial revenue from California consumers in this District.

## V. FEDERAL AND STATE PRIVACY LAWS

### 1. The California Invasion of Privacy Act (CIPA)

25. The California Invasion of Privacy Act (CIPA) is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the

purpose of eavesdropping upon private communications ... has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society" (Cal. Penal Code § 630).

26. Despite predating the Internet, CIPA has been applied to email and other Internet communications so long as that application is consistent with the statutory text and purpose. Section 631(a) reaches the interception of email content and online communications and consent under CIPA must be obtained before the interception occurs.

27. CIPA's text and history confirm that the Legislature intended to protect core privacy rights, as reflected in § 630's declaration that the statute was enacted to protect the right of privacy of the people of this state. CIPA codifies a substantive right to privacy such that the violations of CIPA alleged herein, which implicate traditional interests in personal privacy, constitute concrete injuries sufficient to establish Article III standing. The communications intercepted here were not bare records of connection. They were the addresses and the titles of pages concerning consumer credit card products, savings and money market accounts, individual retirement accounts, wealth management, financial planning and life insurance, and the management of personal debt and spending, each transmitted to a third party attached to a persistent identifier that recognizes the browser across sessions.

28. Individuals may pursue legal action against violators of Cal. Penal Code § 631 and are entitled to seek $5,000 in statutory penalties per violation. Cal. Penal Code § 637.2(a)(1).

**2. The Federal Wiretap Act**

29. The Federal Wiretap Act, enacted as Title III of the Omnibus Crime Control and Safe Streets Act of 1968 and amended by the Electronic Communications Privacy Act (ECPA) of 1986, prohibits the intentional interception of wire, oral, or electronic communications. Congress enacted the statute to safeguard the privacy of communications against unauthorized interception, recognizing that unchecked

surveillance technology poses a fundamental threat to individual liberty.

30. The Federal Wiretap Act applies to communications transmitted over the Internet. The 1986 ECPA amendments expressly extended the statute's protections to electronic communications as defined under 18 U.S.C. § 2510(12) to include "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." That includes data transmitted over the internet such as the contents of web browsing activity via HTTP requests as alleged here.

31. A person whose electronic communications are intercepted in violation of 18 U.S.C. § 2511 may bring a civil action pursuant to 18 U.S.C. § 2520(a). Available relief includes the greater of actual damages or statutory damages of $100 per day for each day of violation or $10,000, whichever is greater, plus punitive damages in appropriate cases, reasonable attorney's fees, and other litigation costs reasonably incurred.

## VI. SPECIFIC ALLEGATIONS

32. During her use of the Website, Plaintiff navigated to the following pages, unaware that Defendant was causing and permitting the Third Party to intercept the contents of her communications:

- https://www.cathaybank.com/personal/credit-cards;
- https://www.cathaybank.com/personal/savings/smart-money-market;
- https://www.cathaybank.com/wealth-management;
- https://www.cathaybank.com/about-us/insights-by-cathay/spending-habits-and-their-impact-on-your-finances;
- https://www.cathaybank.com/about-us/insights-by-cathay/balance-debt-payments-vs-savings; and
- https://www.cathaybank.com/personal/savings/IRA-CDs.

33. During each of the visits identified above, the Tracker described below operated on the Website. The Tracker received the contents of Plaintiff's communications with the Website in named parameters of its own outbound requests.

**1. The Google Tracker**

34. Defendant embedded and configured on the Website an advertising tag operated by Google LLC. Defendant deploys that tag through Google's tag-management product, which the transmissions themselves identify as their source, and Defendant's own Google Ads conversion identifier, 968391448, appears in the address of four of the five Google endpoints to which Plaintiff's browser was directed and in named parameters of transmissions to the fifth. On information and belief, the Google Ads account to which that identifier corresponds is Defendant's own. The tag is not a resource Plaintiff requested and is not necessary to render the Website's content.

35. Plaintiff's browser began loading the page from Defendant's servers. As part of that same page load, and without any further request or action by Plaintiff, the browser executed Google's code. That code obtained the address of the page then being loaded and the title of that page from the state of the browser for that page, wrote those values into named parameters of new requests, and directed Plaintiff's browser to send those requests to five separate Google endpoints: www.google.com/ccm/collect, www.google.com/rmkt/collect, www.googleadservices.com/pagead/conversion, www.googleadservices.com/ccm/conversion, and googleads.g.doubleclick.net/pagead/viewthroughconversion. At the first of those endpoints the address was carried in the named parameter dl and the title in the named parameter dt. At the other four the address was carried in the named parameter url and the title in the named parameter tiba.

36. The values Google received in those named parameters, from Plaintiff's own session, included the full address of each of the pages identified above and the full title of each such page in human readable terms, being "Earn Rewards Every Time You Use Your Credit Card | Cathay Bank," "Smart Money Market | Cathay Bank," "Cathay

Wealth Management | Financial Planning, Security, and Life Insurance Policies," "How Everyday Money Decisions Impact Your Financial Future | Blog," "Paying Off Debt Vs. Saving | Blog," and "Individual Retirement Accounts (IRAs) | Cathay Bank."

37. A persistent Google advertising identifier was transmitted in a named parameter of every one of those requests, and it held a single value throughout Plaintiff's session. It was carried in the outbound requests themselves rather than assigned to Plaintiff's browser in a response. Its value encodes the time at which it was created, which precedes the start of Plaintiff's August 11, 2026 session by approximately nine hours. A second Google identifier, transmitted to two of the five endpoints, encodes the same creation time. The identifier therefore existed before Plaintiff's session began, and the same value was reused on each of the pages identified above.

38. Google publishes documentation addressed to advertisers who install the Google tag under a Google Ads account, which is the integration Defendant deployed and which that documentation describes installing through Google's tag manager. Google states that the tag must be installed on every page of the advertiser's website and that one tag serves each Google Ads account. Google states that once the tag is installed it captures information about the pages viewed by the advertiser's website visitors, that this information includes the page URL and the page title, and that it is used to create the advertiser's data segments comprised of its website visitors. Tag your website using Google Ads, Google Ads Help, https://support.google.com/google-ads/answer/2476688.

39. Composing the address and title of the page Plaintiff was viewing into a segment of the Website's visitors, and attributing that segment to the identifier transmitted alongside them, are operations performed on the transmitted values in response to the request that carries them. Neither can be performed without ascertaining what those values say.

40. At two of the five endpoints, each of Plaintiff's page loads was additionally transmitted with named fields designating the beacon type as a purchase and stating a value of zero. The event type reported to Google on each page load is a matter of

Defendant's own configuration of its Google advertising account.

41. Personalization was not suppressed. The parameter by which an advertiser suppresses personalized advertising accompanied every one of those transmissions, in each instance set to the value denoting personalized rather than non-personalized treatment. No parameter directing the anonymization or truncation of Plaintiff's Internet Protocol address accompanied any of them. Defendant did not obtain Plaintiff's express prior consent to the interception and transmission of the contents of her communications.

42. Figure 1 is a network capture of an outbound request transmitted to Google at www.google.com/ccm/collect during the load of the credit card page identified above. The full page address is carried in the named parameter dl and the full page title in the named parameter dt, together with the Google Ads conversion identifier Defendant configured on the Website and the persistent Google identifier.

**<u>Figure 1</u>**




43. Figure 2 is a network capture of an outbound request transmitted to Google at googleads.g.doubleclick.net/pagead/viewthroughconversion during the load of the same page. The full page address is carried in the named parameter url and the full page title in the named parameter tiba, together with the persistent Google identifier.

**Figure 2**




44. Figure 3 is a network capture of an outbound request transmitted to Google at www.google.com/ccm/collect during the load of the individual retirement account page identified above, carrying the same categories of values.

**Figure 3**




45. Google LLC is not a party to the communications between Plaintiff and the

Website. It operates an advertising and audience data business of its own and has the capability to use its record of these interactions for its own purposes. Defendant aided and abetted that interception by embedding and configuring the tag on the Website.

**2. Interception While in Transit**

46. Two sets of code ran as part of Plaintiff's browser's single attempt to load each page identified above. The first was the Website's own code, which delivered the page Plaintiff had asked for. The second was the Tracker's code, which Plaintiff did not request and which served no part of her request for that page. Plaintiff communicated with Defendant's servers in order to obtain the content she was reading. She did not communicate with the Third Party for that purpose, or for any purpose of her own.

47. The Tracker did not obtain the contents of Plaintiff's communications from Defendant's stored records, and there was no separate transaction in which Defendant later furnished them. There was no interval in which the values sat at rest in Defendant's possession before the Tracker acquired them. The values the Tracker transmitted were read from the state of the browser for the page then being loaded, and they identified that page and no other.

48. Each of those transmissions was therefore initiated by the Tracker's own code and was concurrent with Plaintiff's communications with the Website, and the contents of those communications were acquired while in transit, while passing over a wire, line or cable, and while being sent from and received at Plaintiff's device in California.

49. The duplication was not a single copy. As each page loaded, the address and the title of that page were written into named parameters of separate requests and transmitted, as part of that same page load, to five separate Google endpoints on three separate Google-controlled hosts. The contents of Plaintiff's communication with the Website were therefore replicated and sent in parallel. Plaintiff did not request content from any of those endpoints, none of them was a party to her communications with the Website, and none of them was made known to her.

50. No action by Plaintiff was required to trigger any of these transmissions and none of them was visible to her. Plaintiff had no opportunity to see, review, prevent or object to any of them before they occurred.

51. Defendant knew of this arrangement and constructed it. Defendant's own Google Ads conversion identifier is carried in the address of four of the five receiving endpoints and in named parameters of transmissions to the fifth, and Defendant's own first-party code and tag-management configuration, identified by name in the transmissions themselves, cause the Tracker to load.

## VII. CLASS ALLEGATIONS

52. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

> All persons within California whose electronic communications with the Website, including the URL contents of their HTTP requests to the Website, were intercepted by the Tracker, or by any other third party to which Defendant caused those contents to be transmitted, between August 11, 2025 and the present.

53. NUMEROSITY: Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendant.

54. COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions include but are not limited to:

- Whether Defendant configured the Website to transmit the URL contents of visitors' HTTP requests, and the titles of the pages they viewed, to the Tracker;
- Whether the URL contents of those requests, and the titles of the pages visitors viewed, constitute "contents" of electronic communications within the meaning of Cal. Penal Code § 631(a) and 18 U.S.C. § 2510(8);

- Whether Defendant's conduct constitutes interception of electronic communications in violation of Cal. Penal Code § 631(a);
- Whether Defendant's conduct constitutes intentional interception of electronic communications in violation of 18 U.S.C. § 2511(1)(a);
- Whether Defendant's conduct constitutes an unlawful or unfair business practice under Cal. Bus. & Prof. Code § 17200;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief;
- Whether the Defendant's conduct violates the California Constitution;
- Whether the Defendant's conduct constitutes an intrusion upon seclusion;
- Whether Class Members are entitled to restitution of benefits Defendant obtained through the challenged conduct; and
- Whether Class Members are entitled to restitution.

55. TYPICALITY: As a person who visited the Website and whose URL contents and page titles were intercepted, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Tracker is typical to Class Members.

56. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

57. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation also presents a potential for inconsistent or contradictory judgments.

/ / /

## VIII. FIRST CAUSE OF ACTION

**Violations of Cal. Penal Code § 631**

**By Plaintiff and the Class Members Against Defendant**

58. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

59. Plaintiff brings this cause of action on behalf of herself and the Class.

60. California Penal Code § 631(a) prohibits any person from willfully and without the consent of all parties to the communication reading, or attempting to read, or learning the contents or meaning of any message, report, or communication while the same is in transit, and from using or attempting to use, in any manner or for any purpose, any information so obtained. The same subdivision separately reaches any person "who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

61. The page addresses, and the page titles identifying the subject matter of the pages Plaintiff and Class members were reading, all transmitted to the Tracker in named payload parameters, constitute the "contents" of those communications within the meaning of § 631(a). As described in the preceding tracker-specific allegations, Defendant caused each such communication to be duplicated and sent in parallel to the Tracker at www.google.com/ccm/collect, www.google.com/rmkt/collect, www.googleadservices.com/pagead/conversion, www.googleadservices.com/ccm/conversion and googleads.g.doubleclick.net/pagead/viewthroughconversion, and the Tracker acquired those contents while the same communication was in transit between Plaintiff's browser and Defendant's servers.

62. Defendant intentionally configured the Website to transmit Plaintiff's and Class members' page addresses and page titles to the Tracker, and permitted the Third Party to use that information for the audience segmentation and advertising functions alleged above. The Third Party is not a party to the communications between Plaintiff

and the Website. Plaintiff and Class members did not consent to interception of the contents of their communications by the Tracker, and no other exception to § 631(a) applies. Defendant is independently liable under the aiding provision of § 631(a). Defendant selected the Tracker, obtained an account for it, embedded its code on the Website, configured that code to execute automatically on page load, and caused Plaintiff's own browser to carry out each transmission. In doing so Defendant aided, agreed with, employed and permitted the Third Party to do the acts prohibited by § 631(a), and permitted and caused those acts to be done.

63. Section 631(a) reaches not only reading the contents of a communication but learning its contents or meaning. Composing the address and title of a page into a segment of the website's visitors, and attributing that segment to the identifier transmitted with it, are operations performed on the transmitted values in response to the request that carries them, and neither can be performed without ascertaining what those values say.

64. Each interception constitutes a separate violation of § 631(a). Plaintiff and the Class are entitled to recover the greater of actual damages or $5,000 per violation pursuant to Cal. Penal Code § 637.2(a)(1), injunctive relief, and such other relief as the Court deems just and proper.

## IX. SECOND CAUSE OF ACTION

### Violations of 18 U.S.C. § 2511(1)(a)

### By Plaintiff and the Class Members Against Defendant

65. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

66. Plaintiff brings this cause of action on behalf of herself and the Class.

67. 18 U.S.C. § 2511(1)(a) reaches any person who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." The Federal Wiretap Act defines "contents" to include any information concerning the substance, purport, or meaning of

a communication. 18 U.S.C. § 2510(8).

68. The page addresses and the page titles transmitted to the Tracker in named payload parameters are "contents" of electronic communications within the meaning of 18 U.S.C. § 2510(8), because they communicate the substance, purport and meaning of what Plaintiff and Class members were reading. As described in the preceding tracker-specific allegations, Defendant caused those contents to be duplicated and sent in parallel to the Tracker at the endpoints identified above, and the Tracker acquired them while the same communication was in transit.

69. Defendant intentionally configured the Website to transmit Plaintiff's and Class members' page addresses and page titles to the Tracker, and permitted the Third Party to use that information for the functions alleged above. Defendant thereby intercepted those communications and, independently, procured the Third Party to intercept them, by selecting the Tracker, obtaining an account for it, embedding and configuring its code on the Website, and causing Plaintiff's own browser to execute that code and transmit the contents on each page load. The Third Party is not a party to the communications between Plaintiff and the Website. Plaintiff and Class members did not consent to this interception, and no other exception applies.

70. Plaintiff and the Class are entitled to relief under 18 U.S.C. § 2520, including the greater of the sum of actual damages suffered by Plaintiff and the Class and any profits made by Defendant as a result of the violation, or statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, together with punitive damages, reasonable attorney's fees, and other litigation costs reasonably incurred.

## X. <u>THIRD CAUSE OF ACTION</u>

### Violations of Business & Professions Code § 17200

### By Plaintiff and the Class Members Against Defendant

71. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

72. Plaintiff brings this cause of action on behalf of herself and the Class.

73. California Business and Professions Code § 17200 prohibits any unlawful, unfair, or fraudulent business act or practice. Defendant's conduct constitutes both an unlawful and an unfair business practice.

74. Defendant's conduct is unlawful. By facilitating the interception of the contents of Plaintiff's and Class members' electronic communications without consent, Defendant violated California Penal Code § 631(a) and 18 U.S.C. § 2511(1)(a). Each statutory violation constitutes a predicate unlawful business act or practice under § 17200.

75. Defendant's conduct is also unfair. Defendant covertly transmitted Plaintiff's and Class members' URL contents and page titles to a third-party Tracker for its own advertising purposes without disclosure, authorization, or compensation. The harm to Plaintiff and the Class including but not limited to the interception and commercial exploitation of personal information and the financial value thereof is substantial, is not outweighed by any legitimate countervailing benefit, and could not reasonably have been avoided by Plaintiff or Class members.

76. Plaintiff and Class members suffered injury in fact and lost money or property as a result of Defendant's conduct. Browsing data identifying the specific content a user views, including browsing URLs and page titles of the kind intercepted here, has recognized and quantifiable economic value in the digital advertising marketplace. The Third Party is designed to use, and on information and belief did use, the intercepted content for the audience segmentation and advertising functions alleged above.

77. Defendant appropriated that value for its own advertising purposes without disclosure, without consent, and without compensation. Defendant obtained the benefit of Plaintiff's and Class members' browsing data in the form of the advertising capabilities described above, including the ability to identify the visitors to its Website and to direct advertising for its own products to them. Plaintiff and Class members were

thereby deprived of the economic value of their data and of the full value of a privacy-protective browsing experience they reasonably expected and would have bargained for had the practice been disclosed.

78. Plaintiff and the Class are entitled to injunctive relief prohibiting Defendant from continuing its unlawful and unfair practices, restitution of monies acquired by Defendant through those practices, and reasonable attorney's fees pursuant to California Code of Civil Procedure § 1021.5.

## XI. FOURTH CAUSE OF ACTION

### Violation of the California Constitution, Article I, Section 1

### By Plaintiff and the Class Members Against Defendant

79. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

80. Plaintiff brings this cause of action on behalf of herself and the Class.

81. Article I, Section 1 of the California Constitution provides that privacy is among the inalienable rights of all people in California. To state a claim for violation of the constitutional right to privacy, a plaintiff must establish: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by the defendant constituting a serious invasion of privacy.

82. Plaintiff and Class Members have a legally protected privacy interest in the contents of their electronic communications with the Website, including the specific page addresses and page titles reflecting their browsing activity. California law recognizes a legally protected privacy interest in personal browsing activity, particularly when that activity is covertly intercepted by a commercial third party for advertising and profiling purposes without disclosure or consent. The Legislature has separately recognized the privacy interest in a consumer's dealings with a financial institution, and has built a protective regime around it in the California Financial Information Privacy Act, Cal. Fin. Code § 4050 et seq.

83. Plaintiff and Class Members had a reasonable expectation of privacy in the

contents of their electronic communications with the Website. A reasonable person visiting the website of the bank at which she may hold or seek an account does not expect that the specific pages she browses, and the titles of those pages identifying the credit, deposit, retirement and wealth management products she is considering, will be covertly transmitted to a separate commercial advertising company in real time, linked to a persistent cross-session identifier, and used for advertising targeting and audience segmentation.

84. Defendant's conduct constitutes a serious invasion of that privacy. By embedding and configuring the third-party tracking technology described above on the Website, Defendant caused the covert transmission to that third party, in real time and in named parameters of its own requests, of the addresses and titles identifying the specific financial products and financial subject matter Plaintiff and Class Members were reading about, each attributed to a persistent identifier. Measured against community norms rather than against any characteristic particular to Plaintiff, that conduct constitutes an egregious breach of social norms.

85. As a result of Defendant's invasion of their privacy, Plaintiff and Class Members have suffered harm, including loss of privacy, loss of control over their personal information, and the unauthorized commercial exploitation of their browsing activity. Plaintiff and the Class seek injunctive relief, nominal damages, and all other relief authorized by law.

## XII. <u>FIFTH CAUSE OF ACTION</u>

### Intrusion Upon Seclusion

### By Plaintiff and the Class Members Against Defendant

86. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

87. Plaintiff brings this cause of action on behalf of herself and the Class.

88. The common law tort of intrusion upon seclusion requires: (1) an intentional intrusion, physically or otherwise, into a place, conversation, or matter in

which the plaintiff has a reasonable expectation of privacy; and (2) that the intrusion would be highly offensive to a reasonable person.

89. Defendant intentionally intruded into Plaintiff's and Class Members' electronic communications with the Website by deliberately embedding third-party tracking technology that intercepted the URL contents and page titles of those communications in real time and transmitted them to a third party. Defendant did so without Plaintiff's knowledge or consent. Plaintiff had a reasonable expectation of privacy in the contents of those communications.

90. The intrusion is highly offensive to a reasonable person. The pages identified above are descriptive on their face, and the addresses and titles transmitted identify the specific banking and financial products and subject matter each visitor was reading about, including credit card products, savings and money market accounts, individual retirement accounts, wealth management and life insurance, and the management of personal debt. Defendant covertly caused that information to be transmitted to five separate endpoints operated by a commercial advertising company, attributing it to a persistent identifier assigned to the visitor's browser, for use in advertising and audience data products. A reasonable person would find the covert transmission of the specific financial subject matter of her own reading to a commercial advertising company, without prior notice and without any opportunity to prevent the transmissions before they occurred, highly offensive. The offensiveness is measured objectively and does not depend on any characteristic particular to Plaintiff.

91. As a result of Defendant's intrusion upon their seclusion, Plaintiff and Class Members have suffered harm, including loss of privacy, emotional distress, and the unauthorized exploitation of their personal information. Plaintiff and the Class seek compensatory damages, nominal damages, injunctive relief, and all other appropriate relief.

/ / /

## XIII. SIXTH CAUSE OF ACTION

### Restitution and Quasi-Contract (Unjust Enrichment)

### By Plaintiff and the Class Members Against Defendant

92. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

93. Plaintiff brings this cause of action on behalf of herself and the Class.

94. Unjust enrichment requires: (1) a benefit conferred on the defendant; (2) at the expense of the plaintiff; and (3) circumstances that make it inequitable for the defendant to retain the benefit without compensating the plaintiff.

95. Defendant received a benefit from the conduct alleged above. Defendant deployed the Tracker under its own Google advertising account in order to identify the visitors to its Website, to build audiences composed of those visitors, and to direct advertising for its own banking products to them. The contents of Plaintiff's and Class Members' communications with the Website were the input that made those capabilities available to Defendant, and Defendant obtained them without paying Plaintiff or Class Members anything.

96. Defendant received this benefit at Plaintiff's and Class Members' expense. Plaintiff's and Class Members' browsing data constitutes personal property with recognized economic value in the digital advertising marketplace. By causing the URL contents and page titles of Plaintiff's communications to be transmitted to a third party under Defendant's own advertising account, Defendant obtained the commercial value of that data without compensation. Plaintiff and Class Members also suffered the loss of control over their personal information, which has recognized economic value as a privacy-protective property interest.

97. It is inequitable for Defendant to retain those benefits without compensating Plaintiff and Class Members whose browsing activity was the source of that commercial value. Defendant's concealment of the tracking arrangement and its failure to obtain Plaintiff's and Class Members' informed consent render retention of those benefits

unjust.

98. Plaintiff and the Class seek restitution of the benefits Defendant obtained from the interception and commercial exploitation of Plaintiff's and Class Members' own communications, measured by the value Defendant realized from those communications and not by any broader measure of Defendant's revenues. Plaintiff pleads this claim in the alternative. Plaintiff lacks an adequate remedy at law as to the relief sought here, because the statutory damages available under Cal. Penal Code § 637.2 and 18 U.S.C. § 2520 are fixed sums that neither reach nor are measured by the benefits Defendant obtained from the ongoing commercial exploitation of Class Members' intercepted communications, and because restitution of those benefits is measured by Defendant's gain rather than by Plaintiff's loss.

## XIV. PRAYER FOR RELIEF

99. WHEREFORE, Plaintiff prays for the following:

1. An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;
2. An order declaring that Defendant's conduct violates Cal. Penal Code § 631(a), 18 U.S.C. § 2511(1)(a), Cal. Bus. & Prof. Code § 17200, et seq., Article I, Section 1 of the California Constitution, and the common law prohibition against intrusion upon seclusion;
3. An order enjoining Defendant from continuing the conduct alleged herein;
4. Statutory damages pursuant to Cal. Penal Code § 637.2(a)(1) of $5,000 per violation;
5. Statutory damages pursuant to 18 U.S.C. § 2520 of the greater of the sum of actual damages and any profits made by Defendant as a result of the violation, or whichever is the greater of $100 a day for each day of violation or $10,000;
6. Punitive damages pursuant to 18 U.S.C. § 2520;

7. Restitution pursuant to Cal. Bus. & Prof. Code § 17200, et seq.;
8. Nominal damages and injunctive relief for violation of Article I, Section 1 of the California Constitution;
9. Compensatory and nominal damages for intrusion upon seclusion;
10. Restitution of the benefits by which Defendant was unjustly enriched at Plaintiff's and Class Members' expense;
11. Prejudgment interest;
12. Reasonable attorney's fees and costs; and
13. Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

100. Plaintiff hereby demands a trial by jury on all causes of action and issues so triable.

Respectfully submitted,

Dated: August 20, 2026

**NATHAN & ASSOCIATES, APC**

By: *<u>/s/ Reuben D. Nathan</u>*
Reuben D. Nathan
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

**LAW OFFICES OF ROSS CORNELL, APC**
Ross Cornell, Esq. (SBN 210413)
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

*Attorneys for Plaintiff and the Putative Class*